UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| ALL PETROLEUM-PRODUCT CARGO ABOARD THE ACHILLEAS WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9398072, | |
| Defendant In Rem, | Civil Action No. 21-0305 (PLF) |
| FUJAIRAH INTERNATIONAL OIL & GAS CORPORATION, | |
| Claimant, | |
| - and - | |
| STEVEN M. GREENBAUM, et al., | |
| Claimants. | |

## UNITED STATES' VERIFIED AMENDED COMPLAINT FOR FORFEITURE IN REM

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia and the Counterintelligence and Export Control Section of the National Security Division, which brings this verified complaint for forfeiture in a civil action *in rem* against the defendant property, namely all petroleum-product cargo formerly aboard the M/T Achilleas (International Maritime Organization ("IMO") No. 9398072) (the "Achilleas"), which pursuant to the Court's interlocutory sale order and subsequent sale has been substituted with the proceeds of that sale (the "Defendant Property"), and alleges as follows:

**NATURE OF ACTION AND THE DEFENDANT IN REM**

1.     This *in rem* forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI") and the Federal Bureau of Investigation ("FBI").  Specifically, the United States is investigating Iran's transportation and sale of oil products for the benefit of sanctioned Iranian entities, including the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Quds Force ("IRGC-QF").  This action seeks to forfeit the Defendant Property which originated from oil terminals in Iran, where it was originally loaded onto two Suezmax tankers affiliated, respectively, with the National Iranian Tanker Company ("NITC") and the IRGC-QF.  Those vessels utilized surreptitious means in order to hide the Defendant Property's Iranian origin and to transfer the Defendant Property onto other vessels moving the cargo into commerce by, and for the benefit of, the National Iranian Oil Company ("NIOC"), NITC, IRGC and the IRGC-QF, each of which has been designated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.

2.     The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(1) as foreign assets: (i) of the IRGC or IRGC-QF, designated foreign terrorist organizations, which have engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property: or (ii) affording a person a source of influence over the IRGC or IRGC-QF.

**JURISDICTION AND VENUE**

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2).

**FACTS GIVING RISE TO FORFEITURE**

I.    **Relevant Participants in the Iranian Oil Industry**

    A.    **The Islamic Revolutionary Guard Corps (IRGC) and the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF).**

5.    The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system.   The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.   IRGC-QF's "support for terrorism [is] well known[.]"   *Hake v. Bank Markazi Jomhouri Islami Iran*, Civ. A. No. 17-0114 (TJK), 2022 WL 4130837, at *11 (D.D.C. Sept. 12, 2022).

6.    The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking."   https://home.treasury.gov/news/press-releases/tg1718.

7.    According to OFAC, "[t]he IRGC and its major holdings . . . have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703.

8.    The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil.   Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries . . . to obfuscate its involvement in selling Iranian oil."   https://home.treasury.gov/news/press-releases/sm767; *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.").

9.      The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703.

10.      The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

11.      The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities. For example, OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East."   https://home.treasury.gov/news/press-releases/sm885; *see also* https://home.treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.").

12.      The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people."   https://home.treasury.gov/news/press-releases/sm885.

13.     On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm.   In part, OFAC found that the IRGC-QF "provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command[.]" *Id.*

14.     As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries.  It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs" and the identities are collected on the SDN List maintained by OFAC.  *See* https://ofac.treasury.gov/specially-designated-nationals-and-blocked-persons-list-sdn-human-readable-lists.  SDNs assets are blocked, and United States persons are generally prohibited from dealing with them.

15.     On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF.  *See* https://home.treasury.gov/news/press-releases/sm0177.

16.     On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1189.  *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/.  The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism."  *Id.*

17.     On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF.  *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html.   That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.*

18.     On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA.  *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

19.     IRGC-QF official Rostam Qasemi (a/k/a Rostam Ghasemi), who previously served as the Iranian Minister of Petroleum from 2011 to 2013, "manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil." https://home.treasury.gov/news/press-releases/sm767. On September 4, 2019, OFAC designated Qasemi "for acting for or on behalf of the IRGC-QF and IRGC-QF Commander Qasem Soleimani." *Id.* Following the death of Soleimani in 2020, Qasemi "assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

20.     The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States, affecting U.S. commerce.  The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

a.      In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

b.      In 2021, "[t]hrough the IRGC-QF, Iran continued its support to several U.S.-designated terrorist groups, providing funding, training, weapons, and equipment to various groups within the region. . . . Iran-backed militias continued sporadic attacks on [the U.S.] Embassy [in] Baghdad and bases hosting U.S. and other Defeat-ISIS forces in Iraq and Syria[.]"  State Dep't 2021 Country Reports on Terrorism, at 125-26, available at:  https://www.state.gov/wp-content/uploads/2023/02/Country_Reports_2021_Complete_MASTER.no_maps-011323-Accessible.pdf.

c.      In 2021, "Iran pursued or supported terrorist attacks against Israeli targets in 2021, including . . . a January bomb attack outside the Israeli embassy in New Delhi for which the Indian government said the IRGC-QF was responsible[.]"  *Id.* at 215.

d.      From 2006 to 2009, a series of terrorist attacks by a group funded and supplied by the IRGC-QF killed or severely injured U.S. military servicemembers and civilians.  *See Neiberger v. Islamic Republic of Iran*, Civ. A. No. 16-2193 (EGS/ZMF), 2022 WL 17370239, at *1 (D.D.C. Sept. 8, 2022).

e.      In 2007, the IRGC-QF continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that killed thousands of U.S. forces, and explosively formed penetrators that have a higher lethality

rate than other types of improvised explosive devices, and were specially designed to defeat armored vehicles used by U.S. forces in Iraq, *see Burks v. Islamic Republic of Iran*, Civ. A. No. 16-1102 (CRC), 2020 WL 13303322, at *2 (D.D.C. Aug. 21, 2020).

f.      In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/; *see also Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 488 (D.D.C. 2021) (Mehta, J.).

g.      In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010).  IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack.  *Id.*

21.    Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad.  Indeed, the entire purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries.  *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States").  These terrorist activities undertaken

in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

**B.      National Iranian Oil Company (NIOC) and Its Subsidiaries**

22.      The Iranian Ministry of Petroleum oversees NIOC, which "is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran." *See* https://home.treasury.gov/news/press-releases/sm1165.

23.      As this Court has noted, "NIOC is one of the world's largest oil companies and generates billions of dollars in revenue each year[.]" *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 110 (D.D.C. 2021) (Moss, J.) (cleaned up).  "[I]t functions primarily as a commercial entity aimed at the production and sale of oil." *Est. of Fishbeck v. Islamic Republic of Iran*, Civ. A. No. 18-2248 (CRC), 2021 WL 6808189, at *3 (D.D.C. Mar. 1, 2021).

24.      According to OFAC, NIOC is "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies." *See* https://home.treasury.gov/news/press-releases/sm885.  Indeed, as this Court has noted, NIOC "after funding its own operations and making investments in Iran's oil industry, its revenue goes to fund the Iranian government[,]" which "depending on the price of oil, revenue from NIOC is between one-third and two-thirds of the Iranian government's total revenue." *Holladay*, 523 F. Supp. 3d at 110 (quoting declaration).

25.      OFAC has found that NIOC supplies crude oil and condensate sold by the IRGC-QF.  *See* https://home.treasury.gov/news/press-releases/sm767.

26.      On September 24, 2012, the U.S.  Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012, finding that NIOC was an agent or affiliate of the IRGC.  *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

27.     On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

28.     In designating and reporting on the activities of NIOC, the Treasury Department made clear that NIOC's efforts are not limited to the domestic borders of Iran, but instead, NIOC undertakes efforts in foreign commerce contrary to the interests of the United States.   For example:

> a.     in designating NIOC, OFAC noted that NIOC engaged in foreign commerce with the illegitimate Maduro regime in Venezuela, including by "charter[ing] multiple vessels to support the transport of tens of thousands of metric tons of gasoline destined for Venezuela[,]" *id.*;

> b.     in designating entities working with NIOC, OFAC noted that NIOC worked with such entities to facilitate shipments of Iranian petroleum to foreign customers of NIOC, *see* https://home.treasury.gov/news/press-releases/jy1115;

> c.     NIOC has entered into fossil fuel supply contracts with foreign organizations, committing itself to provide energy products to foreign companies, *see, e.g., Crescent Petroleum Co. v. Nat'l Iranian Oil Co.*, Civ. A. No. 22-1361 (JMC) (D.D.C. filed May 16, 2022), ECF No. 1 (Compl.) ¶¶ 1-2, 10-15, and using U.S. dollars to transact its business, *id.* ¶ 37; *see also id.*, ECF No. 1-6 at 23; and

> d.     NIOC has entered into agreements to develop oil and gas fields with a Russian-owned energy company, Gazprom, which OFAC has designated under Executive Order 14,0424, as being Russian-government affiliated entities.   *See*

https://www.reuters.com/business/energy/iran-russias-gazprom-sign-primary-deal-energy-cooperation-2022-07-19/

29.　　NIOC's use of foreign commerce to fund and provide material support to the IRGC and IRGC-QF thwart U.S. interests not just by providing a means to finance the wrongful actions of the IRGC and IRGC-QF, which plainly affect commerce with the United States, but also by providing support to regimes hostile to U.S. interests, including Russia.  *See Sealed Case*, 936 F.3d at 589-50 (foreign commerce power allows Congress to outlaw activities "that lends financial support to terrorist organizations in foreign countries when that support merely 'affects' commerce with the United States").  These activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

30.　　NIOC operates through itself and several subsidiaries or components, including NITC and Naftiran Intertrade Co. (NICO) Limited ("Naftiran Intertrade").

1.　　National Iranian Tanker Company (NITC)

31.　　NITC is a subsidiary of NIOC and "is responsible for the transportation of Iranian crude exports." *See* https://home.treasury.gov/news/press-releases/sm1165.

32.　　According to OFAC, "NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah," *id.*, and has provided vessels for use in IRGC-QF oil operations, s*ee* https://home.treasury.gov/news/press-releases/sm767.

33.　　NITC has used front companies to obscure its involvement in such oil shipments. *See* https://home.treasury.gov/news/press-releases/sm1165 ("Furthermore, in order to obfuscate its involvement in shipping activity, NITC set up a front company in the United Arab Emirates (UAE), Atlas Ship Management.  NITC officials also arranged to create a separate UAE-based front company, Atlantic Ship Management Company, ostensibly as an entity to replace Atlas Ship Management.").

34.     On November 5, 2018, OFAC designated NITC pursuant to Executive Order 13,599 for its connections to the Government of Iran and its role in the Iranian shipping sector. *See* https://home.treasury.gov/news/press-releases/sm541.

35.     On October 26, 2020, OFAC designated NITC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

2.     Naftiran Intertrade Co. Limited a/k/a NICO (Naftiran Intertrade).

36.     Naftiran Intertrade Company Ltd. ("Naftiran Intertrade") is a Switzerland-based subsidiary of NIOC and acts as the marketing arm of NIOC.   *See* https://home.treasury.gov/news/press-releases/hp1299;  https://home.treasury.gov/news/press-releases/jy1115;  https://home.treasury.gov/news/press-releases/sm1165

37.     OFAC has included Naftiran Intertrade on its SDN List and identified it as being owned or controlled by the Iranian government pursuant to Executive Order 13,599.  *See* https://home.treasury.gov/news/press-releases/hp1299.

38.     Naftiran Intertrade is a key player in Iran's energy sector and historically has purchased most of Iran's gasoline imports.  *See* Time, *Sleeping with the Enemy: BP's Deals with Iran*,  available  at  https://web.archive.org/web/20100618113610/http://www.time.com/time/nation/article/0,8599,1996921,00.html  (Jun. 16, 2010).

## II.     Importance of Petroleum and Shipping Industries to the IRGC.

39.     OFAC has observed that IRGC-QF deliberately utilizes a "complex network of intermediaries," including "dozens of ship managers, vessels, and facilitators," for the purpose of "obfuscate[ing] its involvement in selling Iranian oil." *See* https://home.treasury.gov/news/press-releases/sm767.

40.     In spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions.  *Id.*  These shipments, taken collectively, sold for more than half a billion dollars.  *Id.*  The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.  *Id.*

41.     In designating NIOC and NITC under Executive Order 13,224, OFAC reported: "NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.   "The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF." *Id.*

42.     According to OFAC, the IRGC uses the proceeds from its involvement in the oil industry and other sectors of the Iranian economy to "support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad." *See* https://home.treasury.gov/news/press-releases/sm703.

43.     OFAC has reported that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East."  *See*  https://home.treasury.gov/news/press-releases/sm885.   Then-Treasury Secretary Mnuchin added: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." *Id.*

III.    **The Defendant Property is Iranian Petroleum and Was Peddled in Foreign Commerce in Furtherance of the Illicit Activities of the Iranian State Actors.**

44.    The Defendant Property originated from Iran.

45.    Through a series of transfers and the use of surreptitious means, the Defendant Property ultimately found its way to be on board the Achilleas.

A.    **Part of the Defendant Property Was Loaded Onto the Sarak from Sirri Island, Iran.**

46.    On or around May 29, 2020, a Suezmax oil tanker, the M/T Sarak (IMO No. 9226968) (the "Sarak"), loaded part of the Defendant Property at the Sirri Island oil terminal in Iran.

47.    At the time, according to the International Maritime Organization, the Sarak was registered in the Marshall Islands and was owned by Yam Shipping Inc.

48.    On September 4, 2019, OFAC added the Sarak to the SDN List for being a part of a large shipping network that is managed by senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi and that financially supports the IRGC-QF and Hizballah. *See* https://home.treasury.gov/news/press-releases/sm767.

B.    **The Sonia I Loaded Part of the Defendant Property at Kharg Island, Iran.**

49.    On or around June 23, 2020, a Suezmax oil tanker, the M/T Sonia I (IMO No. 9357365) (the "Sonia I"), loaded part of the Defendant Property at the Kharg Island oil terminal in Iran.

50.    At the time, according to the International Maritime Organization, the Sonia I was registered in Panama and was purportedly owned by Alp Shipping Inc., which had a listed address of: "Care of NITC, East Shahid Atefi Street 35, Africa Boulevard, PO Box 19395-4833, Tehran, Iran."

51.     On November 5, 2018, OFAC placed the Sonia I on its SDN List due to SONIA I's ties to NITC.  *See* Notice of OFAC Sanctions Actions, 85 Fed. Reg. 18,334 (Apr. 1, 2020).

**C.     The Lubov Received the Defendant Property in Ship-to-Ship Transfers With the Sonia I and Sarak While a Decoy NITC Ship Provided False AIS Transponder Data to Disguise the Lubov's Location.**

52.     Between on or around June 23, 2020, and on or around June 30, 2020, an Iranian-flagged, a very large crude carrier NITC supertanker, the M/T Humanity (IMO No. 9180281) (the "Humanity"), spoofed the location of the M/T Lubov (IMO No. 9293741) (the "Lubov") by assuming the Lubov's Automatic Identification System ("AIS") parameters.

53.     AIS is a system that transmits a ship's position so that other ships are aware of its position and can avoid collisions.

54.     AIS spoofing is a technique where a ship manipulates its AIS transponder to transmit false data such as a ship's location or name.

55.     On June 12, 2020, the Humanity reported her position over AIS in the Gulf of Oman at global positioning system ("GPS") position 25.37113N, 56.56983E.  Subsequently, the Humanity shut off her AIS transponder.

56.     Based on commercially available satellite imagery, the Humanity sailed up the Persian Gulf to temporarily assume her new identity as the Lubov.

57.     On June 23, 2020, once the Humanity began impersonating the Lubov's AIS signature, the Humanity set sail for the Gulf of Oman.

58.     According to commercially available satellite imagery, the Humanity was at GPS Position 28.76802N, 50.01132E, heading southeast away from Lubov and again on June 25, 2020, in the Gulf of Oman at GPS Position 25.79851N, 56.99101E.  In both instances, the Humanity was AIS spoofing as Lubov.

59.     According to commercially available satellite imagery, while the Humanity spoofed its AIS, the Lubov, with her AIS transponder switched off, sailed southeast, a short distance from her original position to GPS Position 29.40953N, 49.32116E, appearing in satellite imagery on June 24, 2020.

60.     On or around June 26, 2020, the Lubov conducted a ship-to-ship transfer with the Sarak, receiving part of the Defendant Property.

61.     On or around June 27, 2020, the Lubov initiated a ship-to-ship transfer with the Sonia I, receiving the remainder of the Defendant Property.

62.     The Lubov completed the second ship-to-ship transfer on June 28, 2020.

63.     Following the ship-to-ship transfer, the Lubov, with AIS still switched off, sailed with the Defendant Property to the Gulf of Oman and replaced the Humanity.  Once the Lubov switched with Humanity, the Lubov restored her AIS.

**D.     The Lubov Transferred the Defendant Property to the Trident Liberty in a Ship-to-Ship Transfer.**

64.     According to AIS data, from July 1, 2020, to August 19, 2020, the Lubov transited the Gulf of Oman and did not load or unload any cargo.

65.     Beginning on or around August 19, 2020, the Lubov transferred the Defendant Property to a then Panamanian-flagged very large crude carrier supertanker, then named the Trident Liberty (IMO No. 9327072) and thereafter Ligera (the "Trident Liberty"), in a ship-to-ship transfer in the Gulf of Oman, off the coast of Khor Fakkan, UAE, GPS Position 25.36104N, 56.42906E.  The transfer took five days to complete.

66.     After its ship-to-ship transfer with the Lubov, the Trident Liberty updated her AIS information to indicate that she was fully laden with two million barrels of oil that she received from the Lubov.

67.     Fujairah International Oil and Gas Company ("FIOGC"), a claimant in this action, confirms that the Trident Liberty's cargo was stemmed from the cargo aboard the Lubov in August 2020.  *See* FIOGC Verified Claim (ECF No. 7) ¶ 19.

68.     After the receiving the Defendant Property from the Lubov, the Trident Liberty drifted off the coast of Oman from August 24, 2020, until November 4, 2020.

**E.     The Trident Liberty Transferred the Defendant Property to the Achilleas in a Ship-to-Ship Transfer.**

69.     On or around October 14, 2020, the purported chartering party, FIOGC entered into a charter agreement with Achilleas Carriers Corp., the owner of the Achilleas, to carry "Basrah light crude oil" to China.

70.     FIOGC provided a fraudulent bill of lading and other records indicating that the Lubov loaded the Defendant Property at Basrah Oil Terminal, Iraq.

71.     That is, On March 16, 2021, the Iraqi State Organization for Marketing of Oil (SOMO), an Iraqi national company responsible for marketing Iraq's oil headquartered in Baghdad, Iraq, posted on its website a "Clarification."

72.     In that Clarification, the Iraqi State Organization for Marketing of Oil responded to reports that the cargo on the Lubov as of June 2020, which was transferred to the Achilleas, was loaded from the Basrah Oil Terminal in Iraq.  In so doing, the Organization "categorically denie[d] that the shipments of crude oil transported on board of the two above-mentioned vessels by Fujairah International Oil & Gas Corp (FIOGC) to be of Iraqi origin."

73.     On or around November 4, 2020, the Trident Liberty transferred the Defendant Property to the Liberian-flagged Achilleas in a ship-to-ship transfer in the Gulf of Oman in the vicinity of GPS position (25.14611N, 56.52729E).  The ship-to-ship transfer concluded on November 17, 2020.

74.     FIOGC confirms that the Achilleas's cargo was stemmed from the cargo aboard the Trident Liberty in November 2020.  *See* FIOGC Verified Claim (ECF No. 7) ¶¶ 24–25.

**IV.     FIOGC Has Repeatedly Peddled in Iranian Petroleum Products and Has Undertaken Deception to Hide its Activities.**

75.     According to FIOGC, it is a company incorporated under the laws of the United Arab Emirates.  *See* FIOGC Verified Claim (ECF No. 7) ¶ 4.

76.     A primary business objective for FIOGC is to act as an intermediary to market, purchase, sell, and transport petroleum products.  *Id.* ¶ 6.

**A.     FIOGC's Operations**

77.     In conducting its businesses FIOGC operates through its own corporate form and through affiliates or other business names, including Time Energy General Trading LLC ("Time Energy") and Egyptian Energy Oil Trading LLC ("Egyptian Energy").

78.     At various points in time, FIOGC's registered internet domains have included fiogc.com, fiogc.net, fiogc.org, fiogc.info, fiogc.co, and fiogc.ae.

79.     Additionally, at various points in time, FIOGC or its officials have registered other internet domains, including egyptianenergy.com, jeybridge.com, and oiltradings.com.

**B.     FIOGC's Commercial Manager, Hani Ali**

80.     In 2020, FIOGC employed Hani Ali ("Ali") as its Commercial Manager.

81.     In his role as Commercial Manager, Ali furthered the affairs of FIGOC's petroleum trading business, including by arranging transactions with purchasers and sellers.

82.     In so doing, Ali used various email addresses, including trading@figoc.ae and trading@egyptianenergy.com, in his role at FIOGC.

83.     In 2020, Ali was also listed as being an employee of an FIOGC affiliate, Time Energy, which had offices in Dubai and Tehran and used the domain timeenergygt.com to conduct its affairs.

**C.    FIOGC, Including Through Ali, Routinely Transacted in Iranian Petroleum Products.**

84.     During 2020, Ali routinely engaged in Iranian petroleum transactions for FIOGC.

85.     For example, in 2020, Ali on behalf of FIOGC was involved in a transaction involving Iranian crude oil being loaded onto a vessel called the Sea Elegance and later the Sea Glamour.  The crude was then mixed with certain condensate to camouflage its Iranian origins and delivered to an intermediary with fake Iraqi origin documents.

86.     After uncovering the scheme, on July 4, 2020, the prospective broker of that cargo wrote Ali complaining of his deceit, noting that Ali had engaged "in an attempt to hide any traces of the Iranian Origin.  Claiming the cargo as Iraqi Origin."

87.     Before the cargo at issue in this case, Ali and FIOGC were also aware that the Lubov was involved in shipping Iranian petroleum products.

88.     For example, in April 2020, Ali received documents from a colleague at Time Energy pertaining to a shipment in early-2020 made by the Lubov, which had previously been known as the Dalton.

89.     Among those documents were bills of lading and source origin reports from NIOC itself, attesting to the Iranian origin of the cargo, specifically being crude oil sourced from Lavan and Sirri (Iranian oil terminals).

D.     **FIOGC Understood the Source of the Defendant Property Was Iran**

90.     While the Defendant Property remained on the Lubov, on July 1, 2020, Ali obtained from a colleague using a jeybridge.com email address assay results for Sirri and Lavan crude oil published by NIOC.

91.     A few weeks later, on July 27, 2020, Ali received from that same colleague testing results of the cargo aboard the Lubov after it completed its second loading from the Sonia I.

92.     Specifically, Ali received testing results from the Lubov from a sample taken on June 27, 2020, for its "Ship Tanks Composite After Loading."

93.     Those testing results expressly identified the cargo as being a blend of Sirri and Lavan petroleum (i.e., petroleum from Iran), listing a vessel name of "Lub. . ." and cargo as being "Blend of Sir . . . co and Lav . . . co".

94.     To obscure the origin of the Cargo, FIOGC appears to have paid cash in the form of U.S. dollars for "documentation charges."   Specifically, a Time Energy "payment acknowledgement" record dated June 18, 2020, reflects that USD $130,000 in cash was paid "for documentation exp for the Ship - MT Lubov (SOMO Basrah Oil Terminal)."

95.     The falsified SOMO source origin documents discussed above were dated just two days after this U.S. dollar cash payment referencing SOMO.  *Supra* ¶ 70.

96.     After the United States informed the owners of the Achilleas that the Defendant Property was of Iranian origin and those owners agreed to cooperate with the United States, FIOGC appears to have undertaken efforts to quantify their potential losses.

97.     Presumably as part of those efforts, on November 30, 2020, FIOGC's operations manager wrote to an affiliate, copying Ali and FIOGC's Chief Financial Officer, asking for information about the costs expended on the vessel.

98.     Specifically, FIOGC's operations manager asked what appears to be an affiliate to populate missing information into a spreadsheet for the Lubov shipment and provide supporting documentation for the costs listed therein, including the above noted cash payment for SOMO "documentation" and other similar cash payments for "documents."

99.     Unlike FIOGC's statements to the owners of the Achilleas and others touting a false Iraqi source of origin, the company's internal spreadsheet in November 2020 continued to list the product as it was originally described to FIOGC, "Lub.. / Sir & Lav Blend[,]" confirming the origin of the Defendant Property was Iran.

## COUNT ONE – FORFEITURE
### (18 U.S.C. § 981(A)(1)(G)(I))

100.    The United States incorporates by reference the allegations set forth in Paragraphs above as if fully set forth herein.

101.    Under the alternative theories described below, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(G).

**A.      The Defendant Property is the Property of NIOC or its Subsidiaries, Which Have Perpetrated and Are Perpetrating a Federal Crime of Terrorism.**

102.    The Defendant Property is the property of NIOC or its subsidiaries, which has perpetrated a federal crime of terrorism themselves, namely knowingly providing material support to a designated terrorist organization.

103.    In transferring the Defendant Property for the purposes of sale, NIOC and its subsidiaries provided or attempted to provide resources to IRGC or IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

104.    18 U.S.C. § 2339B prohibits persons from knowingly providing material support or resources to a foreign terrorist organization or conspiring to do so.

105.   As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

106.   As described above, by selling or facilitating the sale of the Defendant Property, NIOC and its subsidiaries knowingly sought to aid the IRGC and IRGC-QF by providing a source of funding to them.

107.   NIOC and its subsidiaries knowingly provided material support to IRGC and IRGC-QF in foreign commerce as NIOC and its subsidiaries sought to peddle the Defendant Property to foreign purchasers, including using doctored records from a foreign country.

108.   NIOC and its subsidiaries' use of foreign commerce to provide material support to the IRGC and IRGC-QF has a sufficient nexus to the United States as the IRGC and IRGC-QF's wrongful actions affect U.S. commerce, including by killing U.S. nationals, and the introduction of billions of dollars of oil annually into the black market has predictable effects on the price of petroleum and other fossil fuels in the United States as crude oil and other fossil fuels are global commodities.   *See, e.g.,* CNBC, *An Iran nuclear deal revival could dramatically alter oil prices—if it happens*, available at: https://www.cnbc.com/2022/08/31/an-iran-nuclear-deal-revival-could-dramatically-alter-oil-prices.html (Aug. 31, 2022); Reuters, *Oil prices sink $2/bbl on possible Iran oil exports, rising interest rates*, available at: https://www.reuters.com/business/energy/oil-prices-rise-possible-opec-supply-cuts-2022-08-25/ (Aug. 25, 2022) ("Oil prices slumped by about $2 a barrel on Thursday in volatile trade as investors braced for the possible return to global markets of sanctioned Iranian oil exports and on worries that rising U.S. interest rates would weaken fuel demand."); World Bank Group, Middle East and North Africa Region, Office of the Chief Economist, *Lifting Economic Sanctions on Iran: Global Effects and Strategic Responses* (Feb. 2016), available at: https://documents1.worldbank.org/curated/en/298681467

999709496/pdf/WPS7549.pdf ("The lifting of sanctions will have the strongest effect on oil production in Iran, and petroleum and coal products in Israel, the EU, and the US[.]").

109.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as an asset of an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**B.     The Defendant Property is the Property of NIOC or its Subsidiaries, Which Afford Them a Source of Influence Over the IRGC an IRGC-QF.**

110.     The Defendant Property is the property of NIOC or its subsidiaries, which affords them a source of influence over the IRGC and IRGC-QF, entities which have engaged in federal crimes of terrorism.

111.     As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

112.     The IRGC and IRGC-QF have committed numerous terrorism-related offenses identified in 18 U.S.C. § 2332b(g)(5), including the killing and attempts to kill U.S. personnel proscribed by 18 U.S.C. § 1114.

113.     NIOC and its subsidiaries' efforts to sell and facilitate the sale of the Defendant Property were critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *United States v. All Petroleum-Prod. Cargo Aboard the Bella*, Civ. A. No. 20-1791 (JEB), 2021 WL 4502056, at *4 (D.D.C. Oct. 1, 2021). Indeed, such activities concerning the Defendant Property were used to further the affairs of the IRGC and IRGC-QF's terrorist enterprise and to make their prohibited conduct less difficult.

114.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**C.    Alternatively, the Defendant Property is the Property of FIGOC, Which Affords It a Source of Influence Over NIOC and Its Subsidiaries, the IRGC, and the IRGC-QF.**

115.    Alternatively, the Defendant Property is the property of FIOGC, which affords it a source of influence over NIOC or its subsidiaries (NITC or Naftiran Intertrade), the IRGC, and IRGC-QF, entities which have engaged in federal crimes of terrorism.

116.    As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189, and that have committed federal crimes of terrorism identified in 18 U.S.C. § 2332B(g)(5).

117.    As noted above, NIOC and its subsidiaries have themselves engaged in planning or perpetrating a federal crime of terrorism, namely knowingly providing material support to the IRGC and IRGC-QF.

118.    FIOGC's purported purchase of the Defendant Property was critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *Bella*, 2021 WL 4502056, at *4.  Indeed, without firms acting as purchasers of Iranian-sourced petroleum, the efforts of the Iranian State Actors to obtain financing for the terrorist activities of the IRGC and IRGC-QF would fail.  Accordingly, were the Defendant Property the property of FIOGC, FIOGC's purchase of the Iranian-sourced petroleum made the prohibited conduct of NIOC or its subsidiaries, the IRGC, and IRGC-QF less difficult.

119.    The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the

forfeiture should not be decreed; that judgment be entered declaring that the Defendant Property

be forfeited to the United States for disposition according to law; and that the United States be

granted such other relief as this Court may deem just and proper, together with the costs and

disbursements of this action.

Dated: May 1, 2024                    Respectfully submitted,
      Washington, DC

MATTHEW G. OLSEN
Assistant Attorney General

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

By: _____*/s/ Brian P. Hudak*_____
      BRIAN P. HUDAK
      Chief, Civil Division, U.S. Attorney's Office
      601 D Street, NW
      Washington, DC 20530
      (202) 252-7566 (main)

SEAN M. TEPE, D.C. Bar #1001323
STUART D. ALLEN, D.C. Bar #1005102
RAJBIR DATTA, N.Y. Bar #5206073
Assistant United States Attorneys

BENJAMIN HAWK
Deputy Chief
Counterintelligence & Export Control Section
National Security Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 307-5176

*Attorneys for the United States of America*

## **VERIFICATION**

I, Gregory King, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Amended Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 1st day of May 2024.


_____*/s/ Gregory King*_____
Special Agent Gregory King
Homeland Security Investigations


I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Amended Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 1st day of May 2024.

_____*/s/ Cindy Burnham*_____
Special Agent Cindy Burnham
Federal Bureau of Investigation